UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

Civil Action No.

UNITED STATES OF AMERICA, and
THE STATE OF COLORADO,

   Plaintiffs,

 v.

K.P. KAUFFMAN COMPANY, INC.

   Defendant.

---

# COMPLAINT

---

  Plaintiffs, the United States of America, by authority of the Attorney General of the United States and acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), and the State of Colorado, on behalf of the Colorado Department of Public Health and Environment, Air Pollution Control Division ("CDPHE"), file this Complaint and allege as follows:

## <u>NATURE OF ACTION</u>

  1.  This is a civil action against K.P. Kauffman Company, Inc. ("KPK" or "Defendant") pursuant to Section 113(b) of the Clean Air Act (the "Act"), 42 U.S.C. § 7413(b), and Sections 121 and 122 of the Colorado Air Pollution Prevention and Control Act (the "Colorado Act"), C.R.S. §§ 25-7-121 and 122.

2.     Plaintiffs seek injunctive relief and civil penalties for violations of the Act, the Colorado Act, Colorado's federally approved State Implementation Plan ("SIP"), and Colorado Air Quality Control Commission Regulation Number 7 ("Regulation 7"), for unlawful emissions of volatile organic compounds ("VOCs") from storage tanks and their associated Vapor Control Systems, as defined in Paragraph 27, that are part of KPK's hydrocarbon liquid and natural gas production systems in the Denver-Julesburg Basin ("D-J Basin") located in Adams and Weld Counties, Colorado.  Plaintiff CDPHE also seeks injunctive relief and civil penalties for violations of the Colorado Act and certain State-enforceable requirements of Regulation 7, over which this Court has supplemental jurisdiction.

3.     Most of KPK's storage tanks store hydrocarbon liquids.  "Hydrocarbon liquids" are more specifically known as either "condensate" or "crude oil."  Prior to extraction from the ground, hydrocarbon liquids, gases, and produced water are pressurized.  Following extraction, hydrocarbon liquids are separated from the accompanying natural gas near the well-head in a device known as a "separator."  Gases from the separator are sent to upstream collection systems for sale.  Produced water from the separator is sent to holding tank(s) where the water, and any residual hydrocarbon fluids, settle and separate further.  The hydrocarbon liquids are either continuously, or in intermittent batches, emptied from the separator into storage tanks kept at or near atmospheric pressure.  Over-pressurization of a storage tank can damage a tank or cause it to collapse.  As the hydrocarbon liquid is emptied into these tanks, the pressure drops and vapors, which include VOCs and other pollutants, are released or "flashed" into a gaseous state.  Additional vapors are released from the hydrocarbon liquids due to liquid level changes and temperature fluctuations.

4.      The storage tanks are grouped in "tank batteries," many of which KPK has—at various points in time relevant to this Complaint—certified to CDPHE as being controlled to meet the "system-wide" emission reduction requirements of the Colorado SIP.  The system-wide emission reduction requirements mandate at least a specific percentage reduction of all emissions across KPK's tank batteries with uncontrolled actual VOC emissions of 2 tons per year or more.

5.      To meet the system-wide requirements, each of the hydrocarbon liquid storage tanks that is the subject of this Complaint is required to control emissions through the use of air pollution control equipment.  Generally, to meet this requirement, KPK routes tank vapors by vent lines to emission control devices known as "combustors."  Combustors are required to have a control efficiency of at least 95%.

6.      KPK owns and/or operates approximately 124 tank batteries in the D-J Basin that KPK has certified as being controlled to comply with Regulation 7's system-wide VOC reduction requirements as of April 30, 2018.  At some or all of these tank batteries, KPK has violated numerous requirements in Regulation 7 intended to reduce VOC emissions from its storage tanks and their associated Vapor Control Systems.

7.      KPK's failure to comply with these requirements has resulted in significant excess VOC emissions, a precursor to ground-level ozone.  KPK operates in an area where air quality does not meet the National Ambient Air Quality Standards ("NAAQS") for ground-level ozone.  KPK's unlawful emissions contribute to this exceedance of the ozone NAAQS.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the claims arising under the Act pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), and pursuant to 28 U.S.C. §§ 1331, 1345, and 1355.

9.      This Court has supplemental jurisdiction over CDPHE's state law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this District under Section 113(b) of the Act, 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391(b) and 1395(a), because the violations that are the basis of this Complaint occurred in this District, and the facilities at issue are operated by Defendant in this District.

## NOTICES

11.     In a September 2016 meeting and in subsequent discussions, Plaintiffs informed KPK of its noncompliance with the Act, the Colorado Act, and Regulation 7.  EPA formally issued a Notice of Violation to KPK on March 2, 2018.  The State of Colorado issued KPK a Compliance Advisory on December 9, 2015 and a Notice of Violation on March 12, 2018.

12.     Notice has been given to KPK and the appropriate air pollution control agency in the State of Colorado as required by Section 113 of the Act, 42 U.S.C. § 7413.  Notice has also been given to KPK in accordance with applicable requirements of the Colorado Act.

## DEFENDANT

13.     KPK is a privately held company engaged in domestic hydrocarbon liquid and natural gas production and exploration.  KPK is incorporated in California and maintains its principal executive offices in Denver, Colorado.

14.     KPK has hydrocarbon liquid and natural gas production operations in the D-J Basin, primarily in the Wattenberg Field in Adams and Weld Counties, Colorado.  In 2016, KPK's D-J Basin exploration and production operations produced approximately 272,643 barrels of hydrocarbon liquids and over 1.9 billion cubic feet of natural gas.

15.     KPK is a "person" as defined in Section 302(e) of the Act, 42 U.S.C. § 7602(e).

## FACILITIES

16.     KPK operates hundreds of hydrocarbon liquid and natural gas exploration and production facilities in the D-J Basin, primarily in Adams and Weld Counties, Colorado.

17.     As of April 2018, KPK owns and operates 124 tank batteries subject to the system-wide control requirements of Regulation 7 in the 8-Hour Ozone Control Area and 305 total tank batteries in the State.

18.     These exploration and production facilities produce a mixture of hydrocarbon liquids, natural gas, and water.  This mixture flows up the well under pressure to the well-head at the surface and then to a device called a separator.

19.     The purpose of a separator is to separate the effluent from the well into its constituent parts: hydrocarbon liquids, natural gas, and water (also known as "produced water").

20.     The hydrocarbon liquids and produced water, once separated from the natural gas, are temporarily held under pressure in the separator until the liquids reach a set level, at which point valves open and the liquids flow into storage tanks kept at or near atmospheric pressure. This is commonly referred to as a "dump."  During a dump, the hydrocarbon liquids and water flow to separate tanks.  Valves controlling the flow of these liquids from the separator may be

configured to operate in an on/off mode, or alternatively, may open in proportion to allow liquids to flow from the well into the separator.

21.     When pressurized hydrocarbon liquids are transferred from a separator to an atmospheric storage tank, the pressure of the hydrocarbon liquids drops.  This loss in pressure drop causes some of the hydrocarbon gases, including VOCs, to vaporize in a phenomenon known as "flashing."  After flashing occurs, the liquids continue to emit vapors due to liquid level changes and temperature fluctuations.  The additional release of gas through diurnal temperature changes occurring while the hydrocarbon liquids are stored in the storage tank or tank battery is known as "breathing" losses.  Breathing losses are sometimes known as "standing" losses.  Vapors are also emitted due to "working" losses, which refers to emissions during the time-period when liquids are being loaded into, or out of, the storage tank.  Flashing, working, and standing losses must be managed to prevent over-pressurization and the release of uncontrolled emissions into the atmosphere.

22.     The tops of the hydrocarbon liquid storage tanks have openings called "thief hatches."  Thief hatches are equipped with gaskets that should seal tight when the thief hatch is closed.

23.     Thief hatches serve three primary purposes: (1) they provide access to the contents of the tank for taking samples and measuring the level of the tank (known as "gauging"); (2) they provide a means of relieving pressure from the tank to prevent over-pressurization; and (3) they eliminate excessive vacuum buildup within the tanks.

24.     To prevent over-pressurization, thief hatches are designed to open (or vent) when the pressure inside the tank exceeds the pressure setting of the thief hatch.  Thief hatches are required not to vent emissions during normal operations.

25.     Thief hatches may also emit vapors to the atmosphere if thief hatch gaskets are worn or otherwise not properly maintained or if the thief hatch is not properly sealed.

26.     In addition to thief hatches, the storage tanks may also be equipped with separate pressure relief valves ("PRVs"), which are also designed to vent at set pressures to prevent over-pressurization.  Like thief hatches, PRVs are required to not vent emissions during normal operations.

27.     The storage tanks, combustors, vent lines from storage tanks to combustors, and all connections, fittings, thief hatches, PRVs, and any other appurtenances used to contain and collect vapors or to convey vapors to a combustor are collectively known as the "Vapor Control System."  KPK may use a single Vapor Control System to transmit vapors from one or more tanks to one or more combustors.

28.     The specific tank batteries that are the subject of the violations alleged in this Complaint include but are not limited to the tank batteries identified in Appendix A, incorporated herein by reference.

## STATUTORY AND REGULATORY BACKGROUND

29.     As set forth in Section 101(b)(1) of the Act, 42 U.S.C. § 7401(b)(1), the purpose of the Clean Air Act is to protect and enhance the quality of the nation's air, so as to promote the public health and welfare and the productive capacity of its population.

A. **National Ambient Air Quality Standards (NAAQS) for Ozone**

30.     Section 108 of the Act, 42 U.S.C. § 7408, directs EPA to identify air pollutants that "may reasonably be anticipated to endanger public health or welfare" and to issue air quality criteria for those pollutants based on "the latest scientific knowledge" about their effects on public health and the environment.  These pollutants are known as "criteria pollutants."

31.     Section 109 of the Act, 42 U.S.C. § 7409, requires EPA to establish both primary and secondary NAAQS for criteria pollutants.  The primary standard must be set at the level "requisite to protect the public health" with an adequate margin of safety, and the secondary standard is intended to protect "the public welfare."  According to Section 302(h) of the Act, 42 U.S.C. § 7602(h), public welfare effects are "effects on soils, water, crops, vegetation" and other environmental impacts including, but not limited to, effects on animals, wildlife, property, and "effects on economic values."

32.     Ground-level ozone, commonly known as "smog," is one of six criteria pollutants for which EPA has promulgated NAAQS due to its adverse effects on human health and the environment. Short-term exposures (1 to 3 hours) to ground-level ozone can cause acute health effects observed even at low concentrations, including temporary pulmonary inflammation. Long-term exposure (months to years) may cause permanent damage to lung tissue.  Children and adults who are active outdoors are particularly susceptible to the adverse effects of exposure to ozone.  *See* 73 Fed. Reg. 16,436 (Mar. 27, 2008).

33.     Ozone is not emitted directly from sources of air pollution.  Ozone is a photochemical oxidant, formed when certain chemicals react with oxygen in the presence of sunlight.  These chemicals – VOCs and nitrogen oxides ("NOx") – are called "ozone

precursors." Sources that emit ozone precursors are regulated to reduce ground-level ozone. *See* 62 Fed. Reg. 38,856 (July 18, 1997).

34.     In 2008, EPA established a primary and secondary NAAQS for ozone of 0.075 parts per million ("ppm") (measured as an 8-hour average). 73 Fed. Reg. 16,436 (Mar. 27, 2008). In 2015, EPA lowered the primary and secondary NAAQS for ozone to 0.070 ppm (measured as an 8-hour average). 80 Fed. Reg. 65,292 (Oct. 26, 2015).

**B.     <u>Colorado SIP</u>**

35.     Pursuant to Section 107(a) of the Act, 42 U.S.C. § 7407(a), states are primarily responsible for ensuring attainment and maintenance of the NAAQS. States implement the NAAQS on a region-by-region basis, within air quality control regions (or "areas") throughout the state. An area with ambient air concentrations that meets the NAAQS for a particular pollutant is an "attainment" area. An area with ambient air concentrations that exceed the NAAQS is a "nonattainment" area. An area that cannot be classified due to insufficient data is "unclassifiable."

36.     EPA designated the following counties in Colorado as being in nonattainment with the 2008 and 2015 ozone NAAQS: Adams, Arapahoe, Boulder, Broomfield, Denver, Douglas, Jefferson, and portions of Larimer and Weld Counties ("Denver Nonattainment Area"). 77 Fed. Reg. 30,088 (May 21, 2012); 83 Fed. Reg. 25,792 (June 4, 2018).

37.     In June 2016, EPA reclassified the Denver Nonattainment Area from "marginal" to the more severe nonattainment status of "moderate" for the 2008 ozone NAAQS. 81 Fed. Reg. 26,697 (May 4, 2016). In June 2018, EPA classified the Denver Nonattainment Area as a "marginal" nonattainment area for the 2015 ozone NAAQS. 83 Fed. Reg. 25,792 (June 4, 2018).

38.     Pursuant to Section 110(a) of the Act, 42 U.S.C. § 7410(a), each state must adopt and submit to EPA for approval a plan that provides for the implementation, maintenance, and enforcement of the NAAQS for each criteria pollutant in each air quality control region within the state.  This plan is known as a state implementation plan or "SIP."  Section 110(a)(2)(A) of the Act, 42 U.S.C. § 7410(a)(2)(A), requires that each SIP include enforceable emissions limitations and other "control measures, means, or techniques" to ensure attainment of the NAAQS.

39.     After enforceable state emission limitations are approved by EPA, these SIP provisions are federally enforceable under Sections 113(a) and (b) of the Act, 42 U.S.C. §§ 7413(a) and (b).

40.     As required by Section 110(a) of the Act, 42 U.S.C. § 7410(a), the State of Colorado has periodically adopted regulations to provide for the implementation, maintenance, and enforcement of the ozone NAAQS.

41.     Initially adopted by Colorado's Air Quality Control Commission ("AQCC") in the 1970s, Regulation 7, as subsequently amended, includes control measures to reduce VOC emissions from condensate collection, storage, handling, and processing operations.  *See* Colo. Code Regs. § 1001-9 [hereinafter Regulation 7].  The State relies, in part, on Regulation 7 to implement, maintain, and enforce the NAAQS for ozone.[1]  *See* 40 C.F.R. § 52.320.

---

[1] Not all provisions of Regulation 7 have been submitted to EPA for incorporation into the SIP. Those provisions of Regulation 7 that are incorporated into the SIP have also been periodically revised.  EPA last approved a SIP revision on July 3, 2018, with an effective date of August 2, 2018.  83 Fed. Reg. 31,068 (July 3, 2018).  This action approved certain revisions to Regulation 7 submitted on May 5, 2013 and May 31, 2017.  Before EPA acted on these revisions, the EPA-approved SIP used different citations than the State-approved Regulation 7 for the provisions relevant here.  *See* 73 Fed. Reg. 8,194 (Feb. 13, 2008).  For ease of reference, the Complaint uses

42.     Among other things, Regulation 7, Section XII requires each owner or operator to select which of its condensate tanks to control in order to achieve a required, system-wide percentage VOC emissions reduction.

43.     Most of KPK's condensate oil and natural gas production facilities in the D-J Basin, including all the tank batteries that are identified in Appendix A, are located within the Denver Nonattainment Area.

C.     **Applicable Provisions of the Colorado SIP**

44.     SIP-Approved Regulation 7 sets deadlines and requirements for system-wide VOC emission reduction requirements for oil and gas operations in the "8-Hour Ozone Control Area." In meeting these requirements, emission reductions "shall not be required for each and every unit, but instead shall be based on overall reductions in uncontrolled actual emissions from all the atmospheric storage tanks associated with the affected operations for which the owner or operator filed, or was required to file, an APEN pursuant to Regulation 3." Reg. 7, Sec. XII.D). An "APEN" is an Air Pollutant Emission Notice.

45.     The term "8-Hour Ozone Control Area" includes Adams, Arapahoe, Boulder, Douglas, and Jefferson Counties; the Cities and Counties of Denver and Broomfield; and portions of Larimer and Weld Counties. *Id.* Sec. II.A.1.

     a.     Prior to EPA's 2018 approval of Colorado's SIP revisions, system-wide emissions reductions under the SIP were required as follows: "For the period of May 1 through September 30 of each year beginning with 2012, such emissions shall be

_____

citations to the version of Regulation 7 incorporated into the SIP and approved by the State as of the filing of this Complaint, unless otherwise specified.

reduced by 78% from uncontrolled actual emissions on a weekly basis." Reg. 7, Sec. XII.A.2.d (2007).

b.   Beginning with the year 2008, and for each year thereafter, emissions during the non-ozone season (January 1 through April 30 and October 1 through December 31) "shall be reduced by 70% from uncontrolled actual emissions, calculated as an average of the emission reduction achieved during the seven months covered by the two periods." *Id*. Sec. XII.A.2.h.

46.   Effective August 2, 2018, system-wide emission reductions under the SIP are required as follows:[2] System-wide emissions "shall be reduced by 90% from uncontrolled actual emissions on a calendar weekly basis during the weeks May 1 through September 30 and 70% from uncontrolled actual emissions on a calendar monthly basis during the months October 1 through April 30." Reg. 7, Sec. XII.D.2.a(x) (2017).

47.   Each operator must designate which condensate storage tanks it has chosen to control in order to meet the system-wide emission reduction requirements. *See Id.* Sec. XII.F.

48.   Regulation 7, Section XII contains the following general requirements for affected operations:

a.   "All air pollution control equipment used to demonstrate compliance with this Section XII shall be operated and maintained consistent with manufacturer

---

[2]The 90% system-wide emission reduction requirement has been enforceable by the State of Colorado since 2013.  In February 2014, Colorado also amended Regulation 7, Section XVII to provide for further control measures on oil and gas operations on a state-wide basis (i.e., not just in the 8-Hour Ozone Control Area).  These provisions are not enforceable by EPA because they are not part of the Colorado SIP.

specifications and good engineering and maintenance practices. The owner or operator shall keep manufacturer specifications on file." *Id.* Sec. XII.C.1.a.

b. "[A]ll such air pollution control equipment shall be adequately designed and sized to achieve the control efficiency rates required by this Section XII and to handle reasonably foreseeable fluctuations in emissions of volatile organic compounds. Fluctuations in emissions that occur when the separator dumps into the tank are reasonably foreseeable." *Id.*

c. "All condensate collection, storage, processing and handling operations, regardless of size, shall be designed, operated and maintained so as to minimize leakage of volatile organic compounds to the atmosphere to the maximum extent practicable." *Id.* Sec. XII.C.1.b.

These provisions have been federally enforceable since April 14, 2008, when EPA's rule approving the provisions as part of the Colorado SIP took effect. *See* 73 Fed. Reg. 8,194 (Feb. 13, 2008).

49. Most of KPK's condensate and natural gas production facilities in the D-J Basin, including all the tank batteries identified on Appendix A, are located within the 8-Hour Ozone Control Area.

### D. <u>Regulation 7: Applicable State-Enforceable Provisions</u>

50. Beginning May 1, 2011 and for each year thereafter, State-enforceable Regulation 7 requires system-wide emissions "be reduced by 90% from uncontrolled actual emissions on a calendar weekly basis during the weeks May 1 through September 30 and 70% from

uncontrolled actual emissions on a calendar monthly basis during the months October 1 through April 30."  Reg. 7, Sec. XII.D.2.a(x).

51.     In addition to the requirements in the SIP, Colorado has adopted other requirements in Regulation 7 that apply to hydrocarbon liquids and natural gas exploration and production activities.

52.     Regulation 7, Section XVII.B.1.b provides that "[a]t all times, including periods of start-up and shutdown, the facility and air pollution control equipment must be maintained and operated in a manner consistent with good air pollution control practices for minimizing emissions.  Determination of whether or not acceptable operation and maintenance procedures are being used will be based on information available to the Division, which may include, but is not limited to, monitoring results, opacity observations, review of operation and maintenance procedures, and inspection of the source."

53.     Regulation 7, Section XVII.C.2.a provides that "[o]wners or operators of storage tanks must route all hydrocarbon emissions to air pollution control equipment, and must operate without venting hydrocarbon emissions from the thief hatch (or other access point to the tank) or pressure relief device during normal operation, unless venting is reasonably required for maintenance, gauging, or safety of personnel and equipment.  Compliance must be achieved in accordance with the schedule in Section XVII.C.2.b.(ii)."

54.     Regulation 7, Section XVII.C.2.b provides, in relevant part, that "[o]wners or operators of storage tanks subject to the control requirements of Sections XII.D.2, XVII.C.1.a, or XVII.C.1.b must develop, certify, and implement a documented Storage Tank Emission Management System ("STEM") plan to identify, evaluate, and employ appropriate control

technologies, monitoring practices, operational practices, and/or other strategies designed to meet the requirements set forth in Section XVII.C.2.a."

## FACTUAL BACKGROUND

### A.    KPK's Oil and Natural Gas Operations

55.    At all times relevant to this Complaint, KPK conducted oil and natural gas production operations in the 8-Hour Ozone Control Area that are located upstream of a natural gas plant and for which KPK was required to file, and did file, APENs pursuant to AQCC Regulation No. 3, 5 Colo. Code Regs. § 1001-5.

56.    KPK filed APENs with CDPHE for the tank batteries identified in Appendix A. The APENs provide specific identification numbers to the facilities.

57.    KPK has also filed APENs with CDPHE for 83 additional tank batteries that are not specifically identified in Appendix A, but that are also subject to the system-wide control requirements of Regulation 7 referenced in this Complaint.

### B.    Inspections and Follow-Up Investigation

58.    Between September 2013 and April 2015, CDPHE inspectors conducted inspections at KPK tank batteries in the 8-Hour Ozone Control Area.  Using an optical imaging infrared camera ("IR camera"), the inspectors observed emissions at 18 tank batteries (all of which are included in Appendix A).  At one of those tank batteries, inspectors observed emissions on more than one day of inspections.

59.    On December 9, 2015, CDPHE issued a Compliance Advisory to KPK, Case No. 2015-106 (the "2015 Compliance Advisory").  The 2015 Compliance Advisory identifies violations of Regulation 7 at the 18 KPK tank batteries referenced in Paragraph 58.

15

60.     Following the issuance of the 2015 Compliance Advisory, CDPHE inspectors conducted additional inspections of KPK tank batteries in the 8-Hour Ozone Control Area.

61.     On June 21, June 30, and July 22, 2016, EPA and CDPHE inspectors conducted joint inspections of KPK tank batteries in the 8-Hour Ozone Control Area.  Using an IR camera, CDPHE and EPA inspectors observed VOC emissions from 12 out of 19 inspected tank batteries (all of which are included in Appendix A).

62.     In total, between September 13, 2013 and February 22, 2018, CDPHE and EPA inspectors have conducted IR camera inspections at 153 of KPK's tank batteries and observed 59 independent events of VOC emissions at 41 unique KPK tank batteries, in addition to other violations of Regulation 7.

63.     Pursuant to Section 114(a) of the Act, 42 U.S.C. § 7414(a), in August 2015, EPA requested certain information from KPK about the Vapor Control Systems at a subset of KPK's 124 tank batteries.  Based on KPK's response, and subsequent supplemental EPA requests and KPK responses, EPA and CDPHE have concluded that:

   a.  KPK failed to conduct an engineering design analysis to ensure that its Vapor Control Systems were adequately sized to route all vapors to an emissions control device;

   b.  Many of the Vapor Control Systems did not have sufficient capacity to route all vapors from the storage tanks to an emissions control device, causing vapors to be emitted directly to the atmosphere from PRVs, thief hatches or other tank openings; and

   c.  KPK's operations and maintenance practices were inadequate to ensure that all

16

storage tank vapors were routed to and incinerated by an emissions control device.

64.     The 41 tank batteries referenced in Paragraph 62 include:

a.   Tank batteries which, based on analysis of information provided by KPK, were not adequately designed to route all vapors to a control device; and

b.   Tank batteries where CDPHE and EPA inspectors observed VOC emissions using an IR camera, including those tank batteries identified in the 2015 Compliance Advisory and all subsequent inspections discussed above.

65.     At all times relevant to this Complaint, KPK has designated that VOC emissions from each of the 41 tank batteries referenced in Paragraph 62 were being controlled as part of KPK's 8-Hour Ozone Control Area system-wide control strategy to achieve the emission reductions required by Regulation 7, Section XII.D.2.

66.     At all times relevant to this Complaint, each of the 41 tank batteries referenced in Paragraph 62 have been subject to the general requirements of the Colorado SIP, set forth at Regulation 7, Sections XII.D.2, C.1.a–d and the State-enforceable provisions at Regulation 7, Section XII.D.2.a(x) and Section XVII.B.1.b and C.2.a–b.

## FIRST CLAIM FOR RELIEF

(Joint Claim by EPA and CDPHE for Violations of Regulation 7, Section XII.C.1.b[3])

67.     Paragraphs 1 through 66 are re-alleged and incorporated herein by reference.

---

[3] Section XII.D.2.b in the SIP prior to August 2, 2018.

68.     Regulation 7, Section XII.C.1.b requires that "[a]ll condensate collection, storage, processing and handling operations, regardless of size, shall be designed, operated and maintained so as to minimize leakage of volatile organic compounds to the atmosphere to the maximum extent practicable."

69.     KPK failed to conduct a design analysis to determine if the Vapor Control Systems at one or more of its tank batteries in the 8-Hour Ozone Control Area have the capacity to route all VOC emissions to an air pollution control device so as to minimize leakage of VOCs to the atmosphere to the maximum extent practicable.

70.     The Vapor Control Systems at one or more of KPK's tank batteries in the 8-Hour Ozone Control Area do not have sufficient capacity to convey all of the condensate tank vapors from all vapor sources to the emission control device, and therefore are not designed to minimize leakage of VOCs to the maximum extent practicable.

71.     At various periods of time relevant to this Complaint, KPK's operation and maintenance of Vapor Control Systems at some or all of its tank batteries in the 8-Hour Ozone Control Area has failed to minimize VOC emissions to the maximum extent practicable, in violation of Regulation 7, Section XII.C.1.b, due to, one or more of the following reasons, without limitation:

    a.  Failing to prevent venting of VOCs directly to the atmosphere through PRVs, thief hatches, or open or partially open vent lines;

    b.  Failing to promptly respond to emissions observations and take appropriate corrective action to minimize the duration and quantity of emissions;

    c.   Failing to take measures to minimize the occurrence or recurrence of preventable emissions from Vapor Control Systems;

    d.   Failing to promptly clean hydrocarbon liquids stains on condensate storage tanks caused by vapors emanating from PRVs and thief hatches and indicative of tank vapor emissions so that frequency and timing of emissions could be assessed;

    e.   Failing to ensure that all vent lines on Vapor Control Systems have an adequate slope to drain all liquids to adequately sized "drip pots," not evaluating the frequency of liquids buildup impairing the vapor carrying capacity of the vent lines, and not establishing a site-specific line blow-out schedule and/or installing line pressure gauges to monitor obstructions in the vent lines and promptly clearing the lines when obstructed; and

    f.   Failing to keep and regularly review maintenance or inspection records to track recurrent or systemic issues in order to implement proactive measures to replace or upgrade system components to prevent emissions from occurring.

72.    Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), KPK is liable for injunctive relief and civil penalties of up to $37,500 per day for each violation of Regulation 7, Section XII occurring between January 13, 2009 and November 2, 2015.  For violations that occurred after November 2, 2015, KPK is liable for civil penalties of up to $97,229 per day for each violation.  *See* 40 C.F.R. § 19.4.

73.    Pursuant to Sections 121 and 122 of the Colorado Act, KPK is liable for injunctive relief and civil penalties of up to $15,000 per day for each violation.

## SECOND CLAIM FOR RELIEF

(Joint Claim by EPA and CDPHE for Violations of for Violations of Regulation 7, Section XII.C.1.a[4])

74.     Paragraphs 1 through 73 are re-alleged and incorporated herein by reference.

75.     Regulation 7, Section XII.C.1.a requires that:

> All air pollution control equipment … shall be operated and maintained consistent with manufacturer specifications and good engineering and maintenance practices … In addition, all such air pollution control equipment shall be adequately designed and sized to achieve the control efficiency rates required by this Section XII and to handle reasonably foreseeable fluctuations in emissions of volatile organic compounds. Fluctuations in emissions that occur when the separator dumps into the tank are reasonably foreseeable.

76.     At periods of time relevant to this Complaint, KPK's operation and maintenance of air pollution control equipment at some or all of the tank batteries in the 8-Hour Ozone Control Area failed to ensure that the equipment was operated and maintained consistent with manufacturer specifications and good engineering and maintenance practices, and that such equipment was adequately designed and sized to achieve the required control efficiency rates in violation of Regulation 7, Section C.1.a due to, one or more of the following reasons, without limitation:

a.   Failing to operate and maintain air pollution control equipment consistent with manufacturer specifications and good engineering and maintenance practices;

b.   Failing to adequately design and size air pollution control equipment to achieve

---

[4] Section XII.D.2.a in the SIP prior to August 2, 2018.

the control efficiency rates required by applicable State and Federal requirements;

c.   Failing to ensure that air pollution control equipment was capable of handling reasonably foreseeable fluctuations in emissions of VOCs;

d.   Failing to promptly respond to emissions observations and take appropriate corrective action to minimize the duration and quantity of emissions;

e.   Failing to take measures to ensure that the pilot lights on control devices are lit;

f.   Failing to ensure site glasses of the enclosed combustors are clean and can be visually inspected for proper operation;

g.   Failing to take measures to minimize the occurrence or recurrence of preventable emissions from air pollution control equipment; and

h.   Failing to keep and regularly review maintenance or inspection records to track recurrent or systemic issues in order to implement proactive measures to replace or upgrade system components to prevent emissions from occurring.

77.   Pursuant to Section 113(b) of the Act, 42 U.S.C. § 7413(b), KPK is liable for injunctive relief and civil penalties of up to $37,500 per day for each violation of Regulation 7, Section XII occurring between January 13, 2009 and November 2, 2015.  For violations that occurred after November 2, 2015, KPK is liable for civil penalties of up to $97,229 per day for each violation.  *See* 40 C.F.R. § 19.4.

78.   Pursuant to Sections 121 and 122 of the Colorado Act, KPK is liable for injunctive relief and civil penalties of up to $15,000 per day for each violation.

### THIRD CLAIM FOR RELIEF

(CDPHE-only Claim for Violations of Regulation 7)

79.     Paragraphs 1 through 78 are re-alleged and incorporated herein by reference.

80.     Between September 2013 and the date of filing this Complaint, on one or more occasions CDPHE inspectors observed hydrocarbon emissions from access points to storage tanks at some or all of the tank batteries listed in Appendix A.

81.     Despite being notified of these emissions observations, KPK has never made a demonstration to CDPHE that these emissions were not venting from an access point to the storage tank or that KPK operated its facilities in a manner consistent with good air pollution control practices for minimizing emissions.  Further, KPK has not made a demonstration that it has developed, certified and implemented a STEM plan for its facilities that identifies, evaluates, and employs appropriate control technologies, monitoring practices, operational practices, and other strategies designed to meet the requirements of Regulation 7, Section XVII.C.2.a.

82.     As a result, at some or all of the tank batteries listed in Appendix A, and potentially at all storage tanks owned or operated by KPK that are controlled to meet the requirements of Regulation 7, Section XII.D.2, or Section XVII.C, KPK has violated the requirement of Regulation 7, Section XVII.B.1.b to maintain and operate the facility and air pollution control equipment "in a manner consistent with good air pollution control practices for minimizing emissions."

83.     Further, at some or all of the tank batteries listed in Appendix A, KPK has violated the requirement of Regulation 7, Section XVII.C.2.a to "operate without venting hydrocarbon emissions from the thief hatch (or other access point to the tank) or pressure relief device during normal operation, unless venting is reasonably required for maintenance, gauging, or safety of personnel and equipment."

84.     KPK has also violated the requirement of Regulation 7, Section XVII.C.2.b to develop, certify, and implement a STEM plan containing the strategies necessary to ensure compliance with Regulation 7, Section XVII.C.2.a.

85.     Upon information and belief, KPK may also have violated the system-wide control requirement of Regulation 7, Section XII.D.2.a(x), by failing to capture and convey all tank vapors, including VOCs, to an emissions control device, as described in this Complaint.

86.     Pursuant to Sections 121 and 122 of the Colorado Act, KPK is liable for injunctive relief and civil penalties of up to $15,000 per day for each violation

<b><u>FOURTH CLAIM FOR RELIEF</u></b>

(CDPHE-only Claim for Violations of Regulation 7)

87.     Paragraphs 1 through 86 are re-alleged and incorporated herein by reference.

88.     Based on the CDPHE's review of KPK's spreadsheet maintained pursuant to Regulation 7, Section XII.F.3 and submitted to CDPHE on November 30, 2017, CDPHE identified that KPK failed to reduce emissions of VOCs from its condensate tanks by 90% for the week of May 14-20, 2017.

89.     KPK violated Regulation 7, Section XII.D.2.a.(x) by failing to reduce emissions of VOCs from its condensate tanks by 90% from uncontrolled actual emissions on a calendar weekly basis.

90.     Pursuant to Sections 121 and 122 of the Colorado Act, KPK is liable for injunctive relief and civil penalties of up to $15,000 per day for each violation.

## **PRAYER FOR RELIEF**

WHEREFORE, based on the above allegations, Plaintiffs request that this Court:

A.      Permanently enjoin Defendant from further violations of the Act, the Colorado SIP, and Regulation 7, including both the provisions of the Colorado SIP and those State-enforceable provisions cited in the Complaint;

B.      Order Defendant to take appropriate actions to remedy, mitigate, and offset the harm to public health and the environment caused by the violations of the Act, the Colorado SIP, and Regulation 7, including both the provisions of the Colorado SIP and those State-enforceable provisions cited in the Complaint;

C.      Assess a civil penalty against Defendant for each violation of the applicable provisions of the Act and the Colorado SIP, of up to $37,500 per day for each violation occurring between January 13, 2009 and November 2, 2015, and up to $97,229 per day for each violation that occurred after November 2, 2015;

D.      Assess a civil penalty against Defendant pursuant to the Colorado Act for each violation of the State-enforceable provisions of Regulation 7, of up to $15,000 per day for each violation; and

E.      Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

FOR THE UNITED STATES, ON BEHALF OF
THE U.S. ENVIRONMENTAL PROTECTION
AGENCY


JEFFREY H. WOOD
Acting Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice


s/ James D. Freeman
JAMES D. FREEMAN
Environmental Enforcement Section
U.S. Department of Justice
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Telephone: (303) 844-1489
Fax: (303) 844-1350
Email: James.Freeman2@usdoj.gov

/s/ Alexandra B. Sherertz
ALEXANDRA B. SHERERTZ
Trial Attorney
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 514-0414
Fax: (202) 616-2427
Alexandra.Sherertz@usdoj.gov

Attorneys for Plaintiff United States of America

OF COUNSEL:

LAUREN HAMMOND
TIMOTHY J. SULLIVAN
Legal Enforcement Program
Office of Enforcement, Compliance and Environmental Justice
U.S. Environmental Protection Agency
1595 Wynkoop Street
Denver, Colorado 80202

FOR THE STATE OF COLORADO, ON BEHALF
OF THE COLORADO DEPARTMENT OF
PUBLIC HEALTH AND ENVIRONMENT

CYNTHIA COFFMAN
Attorney General
State of Colorado

s/ Claybourne F. Clarke
CLAYBOURNE F. CLARKE*
Colorado Reg. No. 44625
ROBYN WILLE*
Colorado Reg. No. 40915
Senior Assistant Attorneys General
Air Quality Unit
Natural Resources and Environment Section
Department of Law
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 7th Floor
Denver, Colorado 80203
Telephone: (720) 508-6250
Fax: (720) 508-6039
Email: clay.clarke@coag.gov
robyn.wille@coag.gov
*Counsel of Record

Attorneys for Plaintiff State of Colorado